UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| ALLEN W. WILCOX, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> COMMISSIONER OF SOCIAL ) <br> SECURITY, *sued as Kilolo Kijakazi,* ) <br> *Acting Commissioner of the Social* ) <br> *Security Administration*, ) <br> ) <br> Defendant. ) | Case No. 1:22-cv-00187-SLC |

## OPINION AND ORDER

Plaintiff Allen W. Wilcox appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Child Insurance Benefits ("CIB") and Supplemental Security Income ("SSI"). (ECF 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case REMANDED to the Commissioner.

### I. FACTUAL AND PROCEDURAL HISTORY[1]

Wilcox applied for CIB and SSI on June 17, 2019, and April 23, 2020, respectively, alleging disability as of July 10, 2019. (ECF 12 Administrative Record ("AR") 21, 315-21).[2] His claim was denied initially and upon reconsideration. (AR 97-98, 169-170). After a timely request (AR 234-39, 251-56), a hearing was held on September 8, 2021, before administrative law judge ("ALJ") Genevieve Adamo, at which Wilcox, who was represented by a non-attorney

---

[1] The AR page numbers cited herein correspond to the ECF-generated page numbers displayed at the top center of the screen when the AR is open in ECF, rather than the page numbers printed in the lower right corner of each page.

[2] Wilcox had not attained age twenty-two before his alleged onset date. (AR 24); *see* 20 C.F.R. § 404.350(a)(5).

representative,[3] and a vocational expert ("VE") testified. (AR 42-70). On October 26, 2021, the ALJ rendered an unfavorable decision to Wilcox, concluding that he was not disabled because he could perform work that exists in significant numbers in the national economy despite the limitations caused by his impairments. (AR 21-36). Wilcox's request for review was denied by the Appeals Council (AR 6-12), at which point the ALJ's decision became the final decision of the Commissioner, *see* 20 C.F.R. §§ 404.981, 416.1481.

Wilcox filed a complaint with this Court on June 2, 2022, seeking relief from the Commissioner's decision. (ECF 1). In his appeal, Wilcox alleges that: (1) the ALJ relied on unreliable VE testimony when she concluded that there was a significant number of jobs in the economy that Wilcox could perform, and (2) she failed to account for his inability to drive in the residual functional capacity ("RFC") conclusion and in analyzing whether it was work preclusive and whether it supported other limitations. (ECF 15 at 4).

At the time of the ALJ's decision, Wilcox was twenty-three years old (AR 34), had an eleven-grade education (AR 49, 340), and had past relevant work experience as a CNC operator (AR 34, 340). In his application, Wilcox alleged disability due to left side mobility issues and permanent brain damage. (AR 339).

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by

---

[3] Wilcox was represented at the hearing by Tara Budd, a non-attorney eligible for direct payment by the Social Security Administration and who is affiliated with Wilcox's counsel's law firm in this matter, Forbes Disability Group, LLC. (AR 42, 270-71).

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation and quotation marks omitted). The decision will be reversed "only if [it is] not supported by substantial evidence or if the Commissioner applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Id.* (citations omitted). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. ANALYSIS

*A. The Law*

Under the Act, a claimant seeking CIB and SSI must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(l)(A), 1382c(a)(3)(A).[4] A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

---

[4] The regulations specific to CIB are at 20 C.F.R. §§ 404.350 to 404.369. "To be entitled to [CIB] a claimant has to satisfy both the CIB requirements as well as the disability requirements of the Social Security Act." *Hildebrandt v. Astrue*, No. 309-CV-210 CAN, 2010 WL 670211, at *3 (N.D. Ind. Feb. 19, 2010).

techniques." *Id.* §§ 423(d)(3), 1382c(a)(3)(D); *Reading v. Mathews*, 542 F.2d 993, 997 (7th Cir. 1976) (citation omitted).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,[5] requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed in substantial gainful activity, (2) whether he has a severe impairment, (3) whether his impairment is one that the Commissioner considers conclusively disabling, (4) whether he is incapable of performing his past relevant work, and (5) whether he is incapable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); *see also* 20 C.F.R. §§ 404.1520, 416.920.[6] "[A]n affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled." *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). "A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that the claimant is not disabled." *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The Commissioner's Final Decision

On October 26, 2021, the ALJ issued a decision that ultimately became the Commissioner's final decision. (AR 21-36). At step one, the ALJ concluded that Wilcox had not engaged in substantial gainful activity since July 10, 2019, his alleged onset date. (AR 24). At

---

[5] "Under the provisions of [the Act], a wage earner who is entitled to receive old age or disability insurance benefits is also generally eligible to receive Child Insurance Benefits ('CIB') for his or her dependent children." *Lindley for Lindley v. Sullivan*, 889 F.2d 124, 126 (7th Cir. 1989). Therefore, for convenience, the Court will cite to the disability insurance benefits ("DIB") regulations herein, in addition to the SSI references pertaining to Wilcox's SSI application. *See Garza v. Berryhill*, No. 17 CV 4189, 2018 WL 2765921, at *2 (N.D. Ill. June 8, 2018) (evaluating CIB claim under DIB regulations).

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. *Id.* §§ 404.1520(g), 416.920(e).

4

step two, the ALJ found that Wilcox had the following severe impairments: depression, anoxic brain injury, neuropathy, anxiety, neurocognitive disorder, and intellectual disorder/borderline intellectual functioning. (*Id.*). At step three, the ALJ concluded that Wilcox did not have an impairment or combination of impairments severe enough to meet or equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 25). The ALJ then assigned Wilcox the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), specifically, occasionally lift and/or carry 20 pounds, 10 pounds frequently; stand and/or walk for four hours; sit for six hours; never climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; could perform occasional overhead reaching with the bilateral upper extremities and frequent reaching in all other directions; can perform frequent handling and fingering; should avoid unprotected heights, dangerous machinery with unprotected moving mechanical parts, and dangerous terrain; can perform work involving simple instructions and routine, repetitive tasks, defined as tasks and instructions that can be learned through short demonstration, up to and including one month; cannot perform work requiring a specific production rate, such as assembly-line work; can meet production requirements that allow a flexible and goal-oriented pace; can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments, for eight-hour workdays, within the confines of normal work breaks and lunch periods; can make only simple work-related decisions; could respond appropriately to predictable, routine changes in the workplace; could tolerate brief and superficial interaction with supervisors, coworkers, and the general public, which is defined as occasional and casual contact with no prolonged conversations, but contact with supervisors still includes what is necessary for general instruction, task completion, or training.

(AR 29).

The ALJ determined at step four that Wilcox was unable to perform his past relevant work. (AR 34). At step five, the ALJ concluded that given his age, education, work experience, and RFC, Wilcox could perform jobs that exist in substantial numbers in the national economy including marker, cafeteria attendant, and sales attendant. (AR 34-35). As such, Wilcox's application for CIB and SSI was denied. (AR 36).

5

*C. Step-Five Finding*

Wilcox first argues that the ALJ's step-five determination lacks the support of substantial evidence because the VE's methodology in arriving at the number of jobs was unreliable. For the following reasons, Wilcox's argument is ultimately unavailing.

1. <u>Applicable Law</u>

At step five, the Commissioner bears the burden of "providing evidence that demonstrates that . . . work exists in significant numbers in the national economy that [the claimant] can do, given [his] residual functional capacity and vocational factors." 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2). "Because estimating job numbers is no easy feat, ALJs commonly rely on the testimony of [VEs]—professionals with experience in job placement and knowledge of working conditions." *Ruenger v. Kijakazi*, 23 F.4th 760, 761 (7th Cir. 2022) (citing *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019); 20 C.F.R. § 416.966(e)).

"In the context of job-number estimates, substantial evidence requires the ALJ to ensure that the [VE's] estimate is the product of a reliable methodology." *Id.* at 763 (citing *Brace v. Saul*, 970 F.3d 818, 821-22 (7th Cir. 2020)); *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018); *Ehrhart v. Sec'y of Health & Hum. Servs.*, 969 F.2d 534, 540 (7th Cir. 1992). "A methodology is reliable when it is based on 'well-accepted' sources and the [VE] explains her methodology 'cogently and thoroughly.'" *Ruenger*, 23 F.4th at 763 (quoting *Biestek*, 139 S. Ct. at 1155). "And when . . . the claimant challenges the job-number estimate, the ALJ must compel the [VE] to offer a 'reasoned and principled explanation' of the methodology [he] used to produce the estimate." *Id.* (quoting *Chavez*, 895 F.3d at 970). "The expert's explanation must be sufficient to instill some confidence that the estimate was not 'conjured out of whole cloth.'" *Id.* (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)).

Having said that, "[e]stablishing the reliability of a job-number estimate does not require meeting an overly exacting standard." *Chavez*, 895 F.3d at 968. "A VE's estimate will be just that—an estimate." *Id.* "[T]he threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla." *Biestek*, 139 S. Ct. at 1154 (citations and internal quotation marks omitted). "[W]hen a claimant challenges a [VE's] job-number estimates, the ALJ has a duty to spend time inquiring into the expert's methodology." *Ruenger*, 23 F.4th at 764 (citing *Chavez*, 895 F.3d at 970). As the Seventh Circuit opined, even when the ALJ asks the VE to describe his methodology, "substantial evidence requires more. The ALJ must 'hold the [VE] to account for the reliability of [his] job-number estimates." *Id.* (citing *Chavez*, 895 F.3d at 970); *see, e.g.*, *Albright v. Kijakazi*, No. 1:20-CV-438-JPK, 2022 WL 669897, at *7 (N.D. Ind. Mar. 4, 2022).

2. <u>Analysis</u>

At the administrative hearing, the VE testified that a hypothetical individual with Wilcox's age, education, work experience, and RFC could perform the representative light-exertional occupations of retail marker, 65,000 jobs nationally; cafeteria attendant, 30,000 jobs nationally; and sales attendant, 95,000 jobs nationally. (AR 65-66; *see also* AR 35). The ALJ, in reliance on the VE's testimony, concluded that Wilcox was not disabled because he could still perform a significant number of jobs in the national economy despite the credible limitations caused by his impairments. (AR 34).

Wilcox now offers a panoply of arguments seeking to show that the VE's testimony regarding the number of jobs in the national economy is not a product of reliable methodology, and in turn, that the ALJ's step-five finding is not supported by substantial evidence. He first argues that the VE did not know which equations the software he employed relies on. (ECF 15 at

7

10). Wilcox further contends the VE "describes in very general and broad terms the exact goal of any job estimation process" without explaining how he allocated the total number of jobs to the DOT codes because his answers "do not describe the formula, process, principles, or even button clicks within the software used to go from overarching economic data to the specific DOT jobs." (*Id.* at 12).[7] Wilcox also takes issue with the fact that the ALJ "never inquired which [software] product was actually being employed," given that the software company offers tools of varying functions, subscription levels, offerings, and software updates, and with the fact that the ALJ failed to ask whether the VE had experience with the software in the past or what such experience entailed. (ECF 15 at 13). In conclusion, he asserts the VE's testimony fails to provide a cogent and thorough explanation of his methodology and that his job estimation was conjured out of whole cloth. (*Id.* at 9).

When Wilcox's representative first questioned the VE about the methodology he used in arriving at the job numbers, the VE responded that he "reli[ed] upon SkillTRAN." (AR 68).[8] Upon Wilcox's objection, and the ALJ's questioning regarding the information SkillTRAN uses,

---

[7] The Dictionary of Occupational Titles (DOT) is a "Social Security Administration resource[] that list[s] occupations existing in the economy and explain[s] some of the physical and mental requirements of those occupations." *Ferguson v. Berryhill*, 381 F. Supp. 3d 702, 705 n.2 (W.D. Va. 2019) (alterations in original) (quoting *Pearson v. Colvin*, 810 F.3d 204, 205 n.1 (4th Cir. 2015)); *see also Tolbert v. Astrue*, No. 2:07-CV-426-PRC, 2008 WL 4449557, at *2 n.1 (N.D. Ind. Sept. 26, 2008). "The Social Security Administration also uses a companion resource to the DOT, entitled Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (1993) . . . , that explains additional physical and environmental demands of the occupations listed in the DOT." *Ferguson*, 381 F. Supp. 3d at 705 n.2 (quoting *Thomas v. Berryhill*, 916 F.3d 307, 310 n.1 (4th Cir. 2019)).

[8] SkillTRAN is a software producer, which produces a variety of programs for vocational professionals, such as Job Browser Pro and Occubrowse. *See Dunn v. Kijakazi*, No. 20-C-1113, 2021 WL 5105169, at *12 (E.D. Wis. Sept. 24, 2021); *see also About,* SKILLTRAN, https://skilltran.com/index.php/home/about (last visited Sept. 25, 2023). "In contrast to the . . . [often criticized] equal distribution method, SkillTRAN's occupational density method relies on the Department of Labor's Occupational Employment Survey ('OES') to estimate the number of available jobs." *Dawn L.C.*, 2021 WL 4488421, at *6 (citing *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020)). In addition to relying on SkillTRAN, the VE testified that he manually adjusted the numbers of jobs to account for Wilcox's limitations in standing and walking. (AR 66).

the VE then confirmed that SkillTRAN relies on Bureau of Labor Statistics numbers and job searches, and then evaluates the number of jobs in different occupational categories. (AR 69).

Courts have pointed out that "the mere fact that SkillTRAN was used is not itself substantial evidence of reliability." *Eidenier v. Kijakazi*, No. 1:20-CV-277-JPK, 2022 WL 179060, at *8 (N.D. Ind. Jan. 19, 2022) (citations omitted). "[T]he issue . . . is not whether SkillTRAN is reliable as a matter of law, but rather whether the VE's testimony in this case, drawing in part on the SkillTRAN data, was sufficient to sustain the agency's step five burden." *Dunn*, 2021 WL 5105169, at *12 (citing *Bruno*, 817 F. App'x at 243); *Foth v. Saul*, No. 20-CV-113, 2021 WL 535433, at *8 (E.D. Wis. Feb. 12, 2021) ("The Seventh Circuit has not spoken directly on the reliability of the SkillTRAN software, and courts in this circuit have upheld the VE's use of SkillTRAN and the ALJ's reliance on the numbers produced by SkillTRAN when the VE explains the methodology behind SkillTRAN." (collecting cases)).

Here, the VE admitted that he did not know the mathematical equations that SkillTRAN uses to get from the Bureau of Labor Statistics numbers to the national numbers for job classifications. (AR 68). At any rate, this admission is not fatal to the VE's testimony, as a VE's explanation need not "reveal the precise mechanics and statistical model involved." *Bruno*, 817 F. App'x at 243; *see Case v. Kijakazi*, No. 22-2379, 2023 WL 4882880, at *3 (7th Cir. Aug. 1, 2023) ("The inability of the vocational expert to precisely explain the software's algorithms does not render his explanation unreliable." (collecting cases)); *see also Rosner v. Kijakazi*, No. 20-C-1346, 2022 WL 110309, at *3 (E.D. Wis. Jan. 12, 2022). Rather, the VE must provide a "'reasoned and principled explanation [of his methodology],' at least by the low substantial evidence standard," *Bruno*, 817 F. App'x at 243 (quoting *Chavez*, 895 F.3d at 970), sufficient to "instill the court with some confidence in its reliability," *Rosner*, 2022 WL 110309, at *3; *see*

*also Brace*, 970 F.3d at 822 (explaining that a VE's "job-number testimony will survive review under the substantial-evidence standard as long as it rests on a well-accepted methodology and the expert describes the methodology 'cogently and thoroughly'" (quoting *Biestek*, 139 S. Ct. at 1155)).

Significantly, once Wilcox's representative objected to the VE's testimony, the ALJ questioned the VE about his understanding of SkillTRAN's methodology. (AR 68-69); *see Ruenger*, 23 F.4th at 764 ("We are mindful of the time constraints and heavy caseloads faced by ALJs. But when a claimant challenges a vocational expert's job-number estimates, the ALJ has a duty to spend time inquiring into the expert's methodology." (citing *Chavez*, 895 F.3d at 970)). The VE responded:

> [SkillTRAN uses] a variety of different sources. They do use the Bureau of Labor Statistics numbers. But they also research jobs and they analyze it based upon the number of . . . jobs that exist in . . . different occupational categories. But then also, they look at it in terms of industry, and where . . . those jobs exist. So when you do an analysis, you're looking at really two different factors. One, how many total jobs exist and then . . . where they exist in different industries. And so . . . that's how they do a calculation. There are some jobs in the SkillTRAN's system that are – that there's only one job in that particular category so – they're done differently in terms of the way in which they estimate because of the variations and how those numbers of jobs – or how many different jobs are in a particular category.

(AR 69). Thus, upon probing by the ALJ, "the VE explain[ed] the methodology behind SkillTRAN." *Foth*, 2021 WL 535433, at *8 (citations omitted). "[While] the VE's description [of the SkillTRAN software] did not reveal the precise mechanics and statistical model involved, it nevertheless constitutes a 'reasoned and principled explanation,' at least by the low substantial evidence standard." *Bruno*, 817 F. App'x at 243; *Case*, 2023 WL 4882880, at *3; *see, e.g.*, *Fetting v. Kijakazi*, 62 F.4th 332, 339 (7th Cir. 2023) ("[A] VE is not required to use a market study, computer program, or publication to make his calculations." (citations omitted)); *Frankie M. v. Kijakazi*, No. 1:20-CV-228-JVB, 2022 WL 168094, at *2 (N.D. Ind. Jan. 19, 2022)

10

(concluding that the VE's testimony regarding job numbers was sufficiently reliable, where "[t]he VE used the SkillTRAN program, which is accepted in the field, and the VE was able to descriptively, though not mathematically, explain how the program derived its estimates of job numbers").

The VE further stated that SkillTRAN is "the number one, or . . . actually the only" software he was aware VEs use because "[t]hey're the only organization that breaks this down to give estimates of how many jobs may exist in different industries with different job titles." (AR 69). Also, given that the ALJ asked the VE whether the sample jobs identified were consistent with the DOT (AR 66; *see also* AR 35), "which is typically used as a basis for the equal distribution method of estimating available jobs, . . . [t]his indicates that [the VE] did not rely on SkillTRAN alone." *Dawn L. C. v. Comm'r of Soc. Sec.*, No. 3:20-cv-00626-GCS, 2021 WL 4488421, at *7 (S.D. Ill. Sept. 24, 2021) (citation omitted). The ALJ observed that the VE also relied on: (1) the VE's more than forty years of professional experience as a board-certified VE; (2) his own observation of how jobs are performed, and (3) the fact that SkillTRAN was the only software used by other VEs on how many jobs exist in industries in different job titles. (AR 35; *see* AR 67).

This evidence constitutes "more than a mere scintilla," *Biestek*, 139 S. Ct. at 1154, and provides an adequate foundation for the VE's estimates, *see Dawn L.C.*, 2021 WL 4488421, at *7 (finding the VE's reliance on SkillTRAN, the DOT, and her education and experience "provided an adequate foundation for her estimates"). "[T]he ALJ conducted a deeper inquiry into the [VE's] methodology before relying on it," and she was "entitled to conclude that both the expert's use of the software and his prior research and professional experience produced sufficiently reliable estimates." *Case*, 2023 WL 4882880, at *3 ("When questioned, the

vocational expert explained that his estimates were not only the product of the software, but also of his experience providing job counseling, his prior research, and his observations of the jobs in question. The vocational expert here explained that SkillTRAN produces consistent data year over year and that he has personally observed and researched these job categories through four decades of placing workers in jobs.").

Wilcox's criticism of the VE's adjustment of job numbers is likewise unconvincing as the VE explained that his reduction in the number of jobs available in the national economy was based on his own experience and observations. *Compare Westendorf v. Saul*, No. 19-cv-1019-jdp, 2020 WL 4381991, at *4 (W.D. Wis. July 31, 2020) (noting that while a "VE can support her estimates by 'drawing on knowledge of labor market conditions and occupational trends, gleaned from reviewing relevant data sources or from placing workers in jobs,'" the adjustment of the job estimate was not reliable because, among other reasons, "[a]t no point did the VE indicate that . . . she was adjusting those estimates based on her training and experience" (citing *Chavez*, 895 F.3d at 970)), *with* (AR 66-67 (stating that adjustment of job estimate reflecting four hour walking and standing limitation was based on his forty years of experience)).

For the same reasons, the VE's inability to testify which exact program he used in his analysis does not render his testimony unreliable. While "the VE could have explained his methodology more clearly, . . . he gave enough detail for [the Court] to understand the sources of his data and the general process he adopted." *Fetting*, 62 F.4th at 339 (citations omitted) (noting that the VE explained that he used OES numbers and his three decades of job placement experience to calculate his estimates). Of all the cases grappling with whether a VE's testimony regarding his uses of SkillTRAN was reliable, Wilcox does not point to a single one requiring

the VE to testify about which specific SkillTRAN software tool he used for job information, including which subscription level, offering, or software version.[9]

Having considered the record presented, the ALJ's step-five determination about the number of representative jobs is supported by substantial evidence—namely, the testimony of the VE that was a product of reliable methodology.[10] Consequently, the Commissioner's step-five challenge does not merit a remand.

*D. Inability to Drive*

Wilcox also objects to the ALJ's omission of his inability to drive from the RFC. He argues that because his inability to drive relates to his medical condition, the ALJ should have added greater RFC limitations. For the following reasons, Wilcox's argument is persuasive.[11]

1. <u>Applicable Law</u>

The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning eight hours a day, for five days a week. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (bold emphasis omitted). That is, the "RFC does not represent the *least* an individual can do despite his or her limitations

---

[9] In fact, Wilcox's argument seems to dispute that SkillTRAN was a reliable source in itself, a point which courts have repeatedly rejected. Again, the proper standard is not whether SkillTRAN is reliable but whether the VE provided sufficient information about the methodology he used to support his conclusions. *Dunn*, 2021 WL 5105169, at *12. The Court concludes he did so here.

[10] Wilcox disagrees with the ALJ taking administrative notice of the census data in her decision because the VE never cited to this source of data. Even assuming the ALJ could not have cited to the census data or taken administrative notice of the census data, such error would be harmless as ultimately the VE's methodology was reliable. *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination); *see McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("But administrative error may be harmless: we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result.").

[11] Because the Court concludes that remand is required on this ground, the Court does not reach the parties' arguments regarding work attendance and absenteeism, and Wilcox's moderate limitations in using public transit.

or restrictions, but the *most*." *Id.*; *see also Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

> The [RFC] assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

When determining the RFC, the ALJ must consider all medically determinable impairments, mental and physical, even those that are non-severe. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

2. The ALJ's RFC Determination

In assigning the RFC, the ALJ did not add a limitation preventing Wilcox from driving. Rather, in evaluating Wilcox's mental impairments, the ALJ relied on the October 2019 and December 2019 state agency physicians' opinions, which she found persuasive. She stated that the limitations imposed by the physicians were "supported by the overall record, which includes improvement of physical and mental symptoms with treatment, even though [Wilcox] failed to pursue all treatment as prescribed." (AR 32). She further relied on the October 2019 psychological consultative examination, which she found "somewhat persuasive." (*Id.*). She noted the examiner's results concerning Wilcox's "sufficient" understanding, his good memory of task instruction, and his fair concentration. (AR 32-33 (citing AR 1236-43)). The ALJ cited the September 2020 internal medicine consultative examination and concluded it was "partially persuasive." (AR 33 (citing (AR 1338-45)). She discussed the examiner's findings pertaining to Wilcox having normal fine motor skills with normal handling of objects, normal concentration,

and social interaction, intact remote memory, and some short-term memory deficits. (*Id.*). She also considered the October 2020 consultative examination and found memory testing to be generally supported by the overall record, noting that Wilcox had "overall inconsistencies in formal memory testing and testing done by Agency's providers as opposed to the claimant's providers." (*Id.* (citing AR 1346-58)).

The ALJ also addressed Wilcox's physical impairments. She first noted that during a physical therapy evaluation on January 30, 2020, Wilcox had slow gait, decreased strength, decreased range of motion, and poor balance, but that a month later, he showed improved endurance and improved ability to perform exercises on a functional trainer. (AR 31; *see* AR 1254-56, 1268-71). The ALJ noted Wilcox exhibited reduced range of motion during a September 2020 internal medicine consultative examination, but she reported that Wilcox had no gross motor focal deficits, had full grip strength, had the ability to perform fine and gross movements on a sustained basis, had normal sensation, normal right extremity strength, normal heel, toe, and tandem walking, and normal straight leg raising. (AR 31 (citing AR 1338-45)). In discussing the September 2020 consultative examination, the ALJ noted that the examiner's limitations pertaining to Wilcox's physical abilities were not supported by the overall record because the record showed improvement in physical abilities with physical therapy. (AR 33).

3. <u>Analysis</u>

Wilcox cites several medical sources he thinks support greater limitations in the RFC. Specifically, he identifies function reports completed by himself and his mother, his hearing testimony, a November 9, 2018, neuropsychologist opinion following a hospital visit, and a state agency physician's opinion, for the proposition that his inability to drive is directly related to his medical condition—an anoxic brain injury he suffered in October 2018. (ECF 15 at 14). He

further cites to WMS-IV testing performed in October 2020 at the agency's request,[12] and a physical therapy evaluation opinion from January 30, 2020, as medical sources evidencing that his inability to drive derives from his medical condition. (*Id.*). Notably, the WMS-IV testing purportedly shows that Wilcox's ability to hold and manipulate spatial locations and visual details and his ability to recall verbal and visual information are in the extremely low range, and thus, that he wrestles with processing visual materials quickly. (ECF 19 at 3). Wilcox also points to the physical therapy evaluation to show that he has poor coordination of lower extremity placement. (*Id.*).

The November 9, 2018, neuropsychologist opinion Wilcox offers is of particular importance here. Wilcox was hospitalized following an anoxic brain injury in October 2020, and visited Paula Neuman, Psy.D, M.S.C.P, H.S.P.P., for a neuropsychology consultation after his transfer to inpatient rehabilitation. (AR 865).[13] She noted that Wilcox presented with impaired attention, diminished concentration and processing speed, and evidence of abnormal forgetfulness. (AR 867). She further observed Wilcox to have illogical reasoning and little or no insight. (*Id.*). Wilcox was nervous and restless, he had flat affect and was congruent with stated mood. (*Id.*). His overall cognitive status was impaired, as was his self-regulation, executive functioning, reasoning, and judgment. (*Id.*). Dr. Neuman advised Wilcox needed assistance with his decision-making. (*Id.*). She concluded that Wilcox "should not return to driving until receiving clearance from his physician and having an on-the-road driving evaluation." (*Id.*). She further opined that assistance and supervision from Wilcox's family members with his daily life

---

[12] Wilcox refers to the "WMS-IV and WAIS-IV . . . conducted at the agency's request," yet only cites to the October 2020 WMS-IV testing. (ECF 19 at 3).

[13] The ALJ concluded that Wilcox's anoxic brain injury was a severe impairment at step 2. (AR 24).

skills, such as managing medications, was necessary, as he "will likely have difficulty managing [these] activit[ies] independently." (*Id.*).

Following Dr. Neuman's opinion, there is no evidence that Wilcox returned to driving. To the contrary, Wilcox testified that he did not have a driver's license—a fact the ALJ acknowledged in her decision. (AR 30, 49). Wilcox further reported in his function report that he does not drive "[b]ecause of [his] condition." (AR 406). Wilcox's mother's third-party function report—which the ALJ also acknowledged—also reflects that Wilcox had no license because he had slow reflexes. (AR 33, 361).

In contrast, the ALJ did not discuss Dr. Neuman's opinion nor the restriction that Wilcox could not drive, and this omission is fatal to the RFC determination. Indeed, Dr. Neuman is the only medical source of record opining on Wilcox's ability to drive, and her opinion suggests greater limitations than those imposed by the ALJ. *See Rhode v. Saul*, No. 4:18-CV-20-JEM, 2019 WL 3928712, at *3 (N.D. Ind. Aug. 19, 2019) (reversing ALJ's conclusion that the claimant's limitations did not preclude him from driving, despite statements from claimant's treating physician and the claimant himself that he was unable to drive); *Henson v. Kijakazi*, No. 4:20-CV-45-JPK, 2021 WL 4452543, at *4 (N.D. Ind. Sept. 28, 2021) (stating that the ALJ needed to account for evidence that the claimant could drive but that she had to pull over due to memory issues in crafting the RFC); *cf. Pribnow v. Kijakazi*, No. 21-CV-1238-PP, 2023 WL 3061515, at *18 (E.D. Wis. Apr. 24, 2023) (rejecting claimant's argument that the ALJ's conclusion was not supported by substantial evidence because the only medical source discussing claimant's inability to sit did not impose greater limitations than those found by the ALJ).

17

The omission of Dr. Neuman's opinion makes it unclear whether the ALJ overlooked evidence of Wilcox's inability to drive or discounted it. *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) ("Without any discussion . . . this court has no idea what the ALJ thought about this evidence."); *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985) (stating that the ALJ's silence on an issue makes it unclear whether he rejected it, forgot it, or thought it irrelevant); *Zblewski v. Schweiker*, 732 F.2d 75, 78-79 (7th Cir. 1984) (explaining that when the ALJ fails to mention evidence, it is unclear whether it was considered and not credited or ignored, making meaningful appellate review impossible); *Craft*, 539 F.3d at 678. In turn, this means the ALJ failed to build an "accurate and logical bridge between the ALJ's recitation of the . . . medical evidence and the decision to account for [Wilcox's] . . . impairments" by the limitations in the RFC. *Craft*, 539 F.3d at 677-78 (internal quotation marks omitted).[14]

The Commissioner argues that, even if Wilcox is unable to drive, the lack of limitation in the RFC was a harmless error because "none of the jobs identified by the vocational expert required driving or operating a motor vehicle." (ECF 18 at 7 (citations omitted)). However, the Commissioner's argument is misplaced, as the Court is "unable to determine with any confidence whether the agency will reinstate its decision on remand because the agency failed to provide any explanation or discussion" of Wilcox's inability to drive." *Verlee v. Astrue*, No. 1:12-CV-45-TLS-RBC, 2013 WL 1760810, at *5 (N.D. Ind. Apr. 24, 2013); *see Shramek*, 226 F.3d at 814 (explaining that harmless errors are those that do not ultimately impact the outcome of the determination); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("[T]he fact that the

---

[14] Beyond Dr. Neuman's opinion, Wilcox offers other evidence which the ALJ considered in her opinion and found partially persuasive at best and unpersuasive at worst. It is unclear whether the ALJ would have assigned different weight to those sources or whether she would have found additional limitations based on Wilcox's inability to drive when considered in conjunction with Dr. Neuman's opinion. Because the Court concludes that the ALJ erred in omitting Dr. Neumann's opinion, the Court need not evaluate whether those other sources could support additional RFC limitations.

administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless.").

Additionally, "[i]n this [C]ircuit, 'both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (citation omitted); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2010) ("Our cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical."); *Young*, 362 F.3d at 1003 (the ALJ must "include all limitations supported by medical evidence in the record" in a hypothetical to the VE). "The reason for the rule is to ensure that the [VE] does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). "Otherwise, one cannot be assured that the VE's opinion includes only jobs that the claimant can perform." *Gillette v. Berryhill*, No. 1:16-cv-03384-DML-JMS, 2018 WL 1417416, at *4 (S.D. Ind. Mar. 22, 2018) (citing *Steele*, 290 F.3d at 942).

Undoubtedly, and as Wilcox aptly argues, a VE is better positioned than the Court to assess whether the jobs cited in the ALJ's step five determination would require Wilcox to drive. *See Krell v. Saul*, 931 F.3d 582, 584 (7th Cir. 2019) ("Vocational experts . . . have specialized and current knowledge of 'working conditions and physical demands of various jobs; ... the existence and numbers of those jobs in the national economy; and involvement in or knowledge of placing adult workers with disabilities into jobs.'" (citing *Biestek*, 139 S. Ct. at 1152)); (ECF 19 at 4, 4 n.14; ECF 19-1 (citing sales attendant job posting requiring ability to operate a motor

vehicle)); *see also* 20 C.F.R. §§ 404.1566(e), 416.966(e). As such, the Court cannot conclude that failure to add this limitation in the RFC would be a harmless error.[15]

Consequently, the Commissioner's final decision will be reversed and remanded for further consideration of Dr. Neuman's opinion and any other evidence which may support additional RFC limitations pertaining to Wilcox's ability to drive. *See Perkins v. Astrue*, 498 F. App'x 641, 643 (7th Cir. 2013) (remanding the ALJ's decision where "the ALJ overlooked several pieces of contrary evidence"); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) (stating that an ALJ "may not dismiss a line of evidence contrary to the ruling"). On remand, the ALJ should articulate the RFC and her reasoning relating thereto.

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's decision is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is DIRECTED to enter a judgment in favor of Wilcox and against the Commissioner.

SO ORDERED.

Entered this 29th day of September 2023.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[15] It is true that any omission of a limitation from the ALJ's hypothetical may be permissible if the VE was already aware of Wilcox's limitations. *See Steele*, 290 F.3d at 942; *Dudley v. Saul*, No. 1:20-cv-00087-JVB-SLC, 2021 WL 3146531, at *4-6 (N.D. Ind. July 9, 2021), *R. & R. adopted sub nom. Dudley v. Kijakazi*, No. 1:20-CV-87-JVB-SLC, 2021 WL 3146536 (N.D. Ind. July 26, 2021) ("An exception . . . exists for cases in which the [VE] independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them."). However, there is no indication here that the VE independently knew of a limitation relating to Wilcox's inability to drive omitted by the ALJ, and if so, that he would have included this limitation in the number of jobs he testified Wilcox could perform.